**Slip Op. 15-94**

### UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                              :
UNITED STATES,                :
                              :
          Plaintiff,          :   Before: Nicholas Tsoucalas,
                              :           Senior Judge
     v.                       :
                              :   Consol. Court No.: 10-00119
AMERICAN CASUALTY CO. OF      :
READING PENNSYLVANIA, and RUPARI:  PUBLIC VERSION
FOOD SERVICES, INC.           :
                              :
          Defendants,         :
_____:
```

### OPINION AND ORDER

[Plaintiff's request for leave to amend the Complaint is granted in part and denied in part.  Defendant's Motion to Dismiss is denied.]

Dated:August 24, 2015

Mikki Cottet, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Plaintiff.  With her on the brief were Benjamin C. Mizer, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director, of Washington, DC.  Of counsel on the brief was Brian J. Redar, Office of Associate Chief Counsel, U.S. Customs and Border Protection, of Long Beach, CA.

Lawrence M. Friedman, Barnes Richardson & Colburn, of Chicago, IL, argued for Defendant.  With him on the brief were Shama K. Patari, Barnes Richardson & Colburn, of Chicago, IL, and Peter A. Quinter, Gray Robinson, P.A., of Miami, FL.

**Tsoucalas, Senior Judge:** Plaintiff, United States Customs and Border Protection, ("Customs") brought this action to recover civil penalties against Defendant, Rupari Food Services

Inc., ("Rupari" or "Defendant")[1] for violations of Section 592 of the Tariff Act of 1930, 19 U.S.C. § 1592(a)(2012)[2], and Defendant American Casualty Co. of Reading Pennsylvania, ("American Casualty") to recover, under bonds, unpaid customs duties. Rupari moves for dismissal of this action, post-answer, on the grounds that the Complaint fails to state a claim upon which relief can be granted and Customs failed to plead fraud with particularity. Customs opposes dismissal and requests leave to amend its Complaint. For the following reasons, Customs' request for leave to amend the Complaint is granted in part and denied in part, and Defendant's Motion to Dismiss is denied.

## JURISDICTION AND STANDARD OF REVIEW

The Court possesses jurisdiction to hear this action under section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1582 (2012).[3]

A motion to dismiss for a failure to state a claim may be raised by motion under USCIT R. 12(c) after the pleadings are

---

[1]   Plaintiff also filed an action against William Vincent "Rick" Stilwell ("Stilwell") individually, however, all parties agreed to dismiss all claims as to him with prejudice and without costs, fees, and expenses on July 17, 2015. Stipulation of Partial Dismissal, July 17, 2015, ECF No. 104.

[2]   Further citations to the Tariff Act of 1930 are to the relevant portions of Title 19 of the U.S. Code, 2012 edition, and all applicable amendments thereto, unless otherwise noted.

[3]   Further citations to the Customs Courts Act of 1980 are to the relevant portions of Title 28 of the U.S. Code, 2012 edition, and all applicable amendments thereto, unless otherwise noted.

closed but early enough not to delay trial. USCIT R. 12 (h)(2)(B).

A Rule 12(c) motion is reviewed under the same standard as a motion

to dismiss under Rule 12(b)(6). <u>Koyo Corp. of U.S.A. v. United</u>

<u>States</u>, 37 CIT ____, 899 F.Supp.2d 1367, 1370 (2013). When

reviewing a motion to dismiss for failure to state a claim, the

court must accept as true the complaint's undisputed factual

allegations and should construe them in the light most favorable

to the plaintiff. <u>Bank of Guam v. United States</u>, 578 F.3d 1318,

1326 (Fed. Cir. 2009) (quoting <u>Cambridge v. United States</u>, 558

F.3d 1331, 1335 (Fed. Cir. 2009). To survive a motion to dismiss,

a complaint must contain sufficient factual matter, accepted as

true, to state a claim to relief that is plausible on its face.

<u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570, 127 S. Ct. 1955,

1974, 167 L. Ed. 2d 929, 949 (2007). To be plausible, the complaint

need not show a probability of plaintiff's success, but it must

evidence more than a mere possibility of a right to relief. <u>Id.</u> at

556-59, 127 S.Ct at 1965-66, 167 L.Ed.2d at 940-41.

### BACKGROUND

Rupari is a Florida corporation that purchased crawfish

from abroad and sold it to restaurants in the United States. Compl.

¶¶ 3, 12, June 20, 2011, ECF No. 2; Pl.'s Opp'n to Mot. to Dismiss

("Pl.'s Br.") Purchase Agreement Ex. 10, at 13, Mar. 7, 1997, ECF

No. 94-6. Rupari's seafood sales team consisted of Mr. Larry

Floyd ("Floyd"), Vice President of Rupari's Seafood Sales

Division, and Stilwell, a commissioned seafood salesman. Pl.'s Br. Tr. of Dep. of William Vincent Stilwell ("Stilwell Dep.") Ex. 1, at 13-14, Apr. 3, 2013, ECF No. 94-1;  Pl.'s Br. Tr. of Dep. of Rupari Food Services Inc. ("Rupari Dep.") Ex. 2, at 15-16, 17, Apr. 4, 2013, ECF No. 94-2.

In 1997 and 1998, Rupari sold crawfish to members of the Popeye's Operator's Purchasing Cooperative Association ("POPCA"). Mr. Richard Porter ("Porter"), the POPCA director of purchasing and distribution, communicated with Rupari through Floyd regarding the sale of crawfish. Pl.'s Br. Decl. of Richard L. Porter ("Porter Decl.") Ex. 10, at ¶¶ 6, 7, Mar. 16, 2014, ECF No. 94-6.

On March 7, 1997, Porter and Floyd signed a Purchase Agreement wherein Rupari would sell POPCA 148,000 lbs. of "Chinese [c]rawfish [t]ail [m]eat."  Pl.'s Br. Purchase Agreement Ex. 10, at 13, Mar. 7, 1997.  The agreement also stated that a formal POPCA supply agreement would be sent shortly thereafter. Id. Floyd and Porter consummated the formal POPCA supply agreement on June 8, 1997.  Id. at 14.

In August 1997, the United States Department of Commerce ("Commerce") conducted an antidumping investigation concerning crawfish tail meat from China.  Commerce published the final determination of its antidumping investigation of freshwater crawfish tail meat from China on August 1, 1997. Notice of Final Determination of Sales at Less than Fair Value: Freshwater Crawfish

<u>Tail Meat From the People's Republic of China</u>, 62 Fed. Reg. 41,347 (Aug. 1, 1997) (subsequently amended to correct ministerial errors at 62 Fed. Reg. 48,218 (Dep't of Commerce Sept. 15, 1997) ("<u>Final Determination</u>").

Yupeng Fisheries Ltd., ("Yupeng") a Chinese producer and importer of crawfish tail meat, was among the firms investigated by Commerce. <u>Id.</u> Yupeng did not receive a separate rate, and its crawfish tail meat exports were subject to the China-wide rate of 201.63 percent. <u>Id.</u> at 41,358. Whole crawfish, however, were excluded from the scope of the antidumping duty investigation. <u>Id.</u> at 41,347. From 1996 to 1998, Yupeng sold Rupari whole cooked frozen crawfish and cooked frozen crawfish tail meat. Pl.'s Br. Stilwell Dep. Ex. 1, at 17-18.

Floyd and Stilwell mainly communicated with Mr. Tian Wei, a Yupeng salesman, but also communicated with Mr. Wang Yon Min, Yupeng's owner, ("Wang"), regarding the sale of crawfish to Rupari. <u>Id.</u> at 17, 21.

On October 17, 1997, POPCA sent Floyd and Rupari a letter confirming that Popeye's would purchase 1,500 cases of crawfish. Pl.'s Br. Crawfish Confirmation Letter from James Brailey, Purchasing Manager, POPCA, to Floyd Ex. 10, at 30, Oct. 17, 1997.

In November 1997, Wang, Yupeng's owner, created Seamaster Trading Company Ltd. ("Seamaster") which was located in Thailand. Compl. at ¶13. Yupeng shipped crawfish tail meat from

China to Seamaster in Thailand. Pl.'s Br. Packing List, Bill of Lading, Invoice, Manifest or Freight List Ex. 6, at 1-12, ECF No. 94-5. Rupari was aware that Wang created Seamaster and was the principal owner of both Yupeng and Seamaster. Pl.'s Br. Rupari Dep. Ex. 2, at 5.

Wang approached Mr. Somchai Sriviroj, ("Sriviroj") the owner and managing director of Sea Bonanza Foods Company, Ltd., ("Sea Bonanza") a fish processing company in Thailand, and asked if Sea Bonanza could repackage frozen crawfish tail meat. Pl.'s Br. Tr. of Dep. of Sea Bonanza Foods Company, Ltd. Ex. 4, at 8, July 8-9, 2013, ECF No. 94-3.

On November 8, 1997, Seamaster entered into a contract with Sea Bonanza wherein Seamaster would ship crawfish tail meat from China to Thailand, and Sea Bonanza would repackage the crawfish tail meat in exchange for a processing fee. Pl.'s Br. Contract between Sea Master and Sea Bonanza Ex. 5, at 2, Nov. 8, 1997, ECF No. 94-4.

In January and April 1998, Yupeng shipped from China to Seamaster, in Thailand, product invoiced as "frozen crawfish." Pl.'s Br. Invoice Ex. 6, at 1, 3, Jan. 8, 1998, ECF No. 94-5.

Sea Bonanza repacked the frozen crawfish tail meat for Seamaster and labelled the meat a "product of Thailand." Pl.'s Br. Tr. of Dep. of Sea Bonanza Foods Company, Ltd. Ex. 4, at 8, 22. According to the Agricultural Affairs Office at the American

Embassy in Bangkok, crawfish is not harvested in Thailand; moreover, Sea Bonanza never processed live crawfish. Id. at 7, 12; see also Pl.'s Br. Packing List Ex. 6, at 1, Apr. 18, 1998; Pl.'s Br. Facsimile from the Agricultural Affairs Office at the American Embassy in Bangkok, Thailand to Roy Johnson, Louisiana Dept. of Agriculture Ex. 8, at 1, Aug. 5, 1998, ECF No. 94-5.

Rupari assisted Seamaster with obtaining a customs broker and Seamaster became a non-resident importer of crawfish to the United States. Pl.'s Br. Rupari Dep. Ex. 2, at 4; Pl.'s Br. Entry Summary Ex. 11A, at 1-42, Mar. 13, 1998, ECF No. 94-7. Rupari stopped purchasing crawfish tail meat directly from Yupeng and began purchasing crawfish tail meat from Seamaster. See Pl.'s Br. Stilwell Dep. Ex. 1, at 18, 20. Rupari had never purchased crawfish from a source in Thailand prior to purchasing crawfish tail meat from Seamaster. Id. at 20.

On February 24, 1998, Porter sent a letter to Caro Produce regarding POPCA's Crawfish Etouffe promotion beginning March 9, 1998, and ending April 11, 1998. Pl.'s Br. Letter from Porter to Caro Produce-Angel Homan, Ex. 10, at 36, Feb. 24, 1998. The letter recited that POPCA ordered 1,200 cases of crawfish in 24.1 lb. bags from Rupari. Id.

On March 13, 1998, Seamaster filed a consumption entry describing the imported merchandise as 1,900 cartons of frozen crawfish, classified under U.S. Harmonized Tariff Schedule

("HTSUS") 0306.19.0010, free of duty, and marked as a product of Thailand. Pl.'s Br. Entry Summary Ex. 11A, at 1.

American Casualty issued customs bonds to Seamaster for the importation of crawfish tail meat. Compl. At ¶6, Customs Bonds Ex. A, at 2-5, Apr. 15, 1998, ECF No. 2-1. American Casualty, as surety, guaranteed payment for any duty, tax, or charge, or compliance with law or regulation, as a result of Seamaster's imports. Id.

On April 18, 1998, Seamaster filed three consumption entries that described the imported merchandise as 1,750 cartons of cooked crawfish meat, classified under HTSUS 1605.40.1000, free of duty, and marked as products of Thailand. Pl.'s Br. Entry Summary Ex. 11A, at 10. Seamaster did not identify any of the entries as being subject to antidumping orders as required by 19 C.F.R. § 141.61(c). See id. Rupari was listed as the notifying party on certificates of origin that accompanied these four entries. Pl.'s Br. Certificates of Origin Ex. 11A, at 7, 15, 26, 37. The entry summaries, entry documents, invoices, and certificates of origin all stated that the crawfish meat originated in Thailand. Id. at 1-42.

Seamaster, as the importer of record, entered four containers of crawfish tail meat into the commerce of the United States through the Los Angeles/Long Beach Seaport by means of documents filed with Customs that claimed the merchandise

originated in Thailand. Compl. at ¶17. The four entries were released for consumption and Rupari sold some or all of the entries to POPCA. Pl.'s Br. Porter Decl. Ex. 10, at ¶10.  All four entries were subject to a 201.63 percent antidumping duty margin under the antidumping order. <u>Final Determination</u>, 62 Fed. Reg. at 41,358. Seamaster did not classify the entries as subject to antidumping duties, nor did it remit any amount of the applicable duties to Customs. Compl. at ¶18.

On May 4, 1998, Porter had a telephone conversation with Floyd, Rupari's Vice President of seafood sales, regarding the alleged crawfish tail meat purchased from Rupari and upcoming shipments of frozen crawfish tail meat. Pl.'s Br. Ex. 10, at 3-4, Porter Decl. at ¶10. According to Porter:

> During that conversation, I asked Larry [Floyd] how it was that Rupari could sell its Chinese crawfish tail meat so cheaply.  I also commented that Rupari's crawfish was cheaper than all of the other Chinese crawfish tail meat being sold in the United States at that time.  Larry responded that they, which I understood to be Rupari, "can get it in where it would not be known as Chinese crawfish."  I asked Larry how and he explained that the Chinese crawfish tail meat was shipped to Thailand where it was "processed."  He said that the country of origin could be the place where the crawfish is packed.  Larry also used the word "tariff," stating that Rupari's crawfish would not have to pay the same amount in tariffs.  I responded, "Is that on the up-and-up?"  I was uncomfortable with this approach and shared my concern with Larry.

<u>Id.</u>

Also on May 4, 1998, Floyd sent Porter a facsimile on Rupari letterhead, in which he wrote the following:

> As per our conversation on the telephone earlier concerning cooked peeled crawfish meat from Thialand, [sic] this product was cooked in China and sent to Thialand [sic] in the whole round and totally processed in Thailand [sic] and packed under the Seamaster lable [sic]. I really don't understand what all the comotion [sic] is all about because we could bring in the whole cooked product into the United States and peel and pack it here and it would become product of the U.S.A.

Pl.'s Br. Fax from Floyd to Porter Ex. 20, at 1, May 4, 1998, ECF. No. 94-11.

Seamaster, as the importer of record, attempted to enter five more entries of crawfish tail meat into the United States between approximately June 13, 1998, and June 20, 1998. Pl.'s Br. Entry/Immediate Delivery Forms, Certificates of Origin, Bills of Lading, Invoices, Ex. 11B, at 1-28 ECF No. 94-8. Seamaster classified the crawfish tail meat in these five entries as duty free under 1605.40.1000 HTSUS. Id. Seamaster labeled all five entries as products of Thailand. Id. The crawfish tail meat was subject to antidumping duties of 201.63 percent, because it originated in China, but Seamaster did not classify the merchandise properly. Id.; see also Final Determination, 62 Fed. Reg. at 41,358. Customs examined and seized the five entries of crawfish tail meat under 19 U.S.C. § 1595a(c)(2)(E), because the cartons

were intentionally marked as products of Thailand in violation of 19 U.S.C. § 1304. Compl. at ¶21.

On June 26, 1998, Customs issued a request for information to Seamaster, as importer of record, asking them to substantiate the claimed Thai origin of the five seized entries, and asking for an explanation of Seamaster's relationships with Rupari and Sea Bonanza. Pl.'s Br. U.S. Customs Service Request for Information, Ex. 13, at 1, June 26, 1998, ECF No. 94-10.

On June 29, 1998, Customs commenced a fraud investigation against Rupari for the possible circumvention of antidumping duties.  Pl.'s Br. Tr. of Dep. of C. Vernon Francis, Ex. 12, at 12, Sept. 24, 2013, ECF No. 94-9.

On July 1, 1998, Rupari, through its employee, Stilwell, filed a letter with Customs on behalf of Seamaster, the importer of record, wishing to clarify the origin of the crawfish meat. Pl.'s Br. Letter from Stilwell to Mr. David Shaw, US Customs Service, Ex. 15, at 1, July 1, 1998, ECF No. 94-11.  Stilwell stated in the letter that the crawfish tail meat in the five seized entries was "cooked, peeled, and processed" by Sea Bonanza at its plant in Thailand.  Id.

On July 6, 1998, Customs issued a second request for information to Seamaster asking for records from Sea Bonanza to substantiate the facts in the letter referenced claiming that the crawfish tail meat was processed in Thailand from raw crawfish

harvested in Thailand. Pl.'s Br. Second Request for Information Ex. 13, at 2-4.

On July 10, 1998, Rupari, through its employee Stilwell, filed documents in response to this second request for information. Compl. at ¶25. One of those documents was a letter written by Seamaster that authorized Rupari to act as Seamaster's representative in all dealings with Customs related to the release of the seized entries of Chinese crawfish tail meat. Pl.'s Br. Letter of Authorization from Seamaster to U.S. Customs, Ex. 23, at 46, July 9, 1998.

On July 13, 1998, Customs issued a third request for information to Seamaster again asking for further substantiation of the claim that the crawfish originated in Thailand. Pl.'s Br. Third Request for Information Ex. 13, at 5, July 13, 1998.

On July 13, 1998, Rupari, through its employee Stilwell, filed a series of documents with Customs. Compl. at ¶27. Among those documents was a purported letter from Mahyam Tingham Fisheries Co. Ltd. stating that it cultivated crawfish in Bangkok, Thailand, which it sold to Sea Bonanza, complete with invoices for the sale of live crawfish. Pl.'s Br. Letter of Explanation from Mahyam, Ex. 15, at 2-5, July 10, 1998. The Bureau of Business Information of the Government Service Division in Thailand has confirmed that they failed to find any business registration for the name "Mahyam Tingham Fisheries Co., Ltd." Pl.'s Br. Letter

from the Bureau of Business Information of Thailand to Ms. Barry Tang, Ex. 18, at 1, May 10, 2013.

There was also a letter from Sea Bonanza stating that it purchased raw crawfish from Mahyam that it processed into tail meat for sale to Seamaster, which Seamaster then imported into the United States.  Pl.'s Br. Letter of Confirmation from Sea Bonanza, Ex. 23, at 47, July 10, 1998.

[[

]]

On July 25, 1998, Wang, the owner of Yupeng, sent a facsimile to Rupari and Stilwell which stated that Yupeng did not have the money to pay the ocean freight to ship crawfish to Thailand; however, Yupeng would fulfill Rupari's order of "whole crawfish" which would be mixed with "ten tons of crawfish meat." Pl.'s Br. Facsimile from Wang to Rupari Ex. 16, at 1, July 25, 1998, ECF No. 94-11.

On August 5, 1998, the Agricultural Affairs Office of the American Embassy in Thailand confirmed that there was no commercial production of indigenous freshwater crawfish in Thailand. Pl.'s Br. Facsimile from Agricultural Affairs Office, American Embassy, Bangkok, Thailand, to Roy Johnson, Louisiana Dept. of Agriculture, Ex. 8, at 1, Aug. 5, 1998.

On April 9, 2001, Customs sent Rupari and Stilwell a Pre-penalty Notice which set the tentative determination of culpability at fraud, but also noted that "[i]nasmuch as the Government may plead in the alternative in any de novo proceeding before the Court of International Trade, Customs alternatively alleges that the violation in question occurred as a result of negligence or gross negligence."  Pl.'s Br. Pre-penalty Notice,

Ex. 19, at 2, Apr. 9, 2001, ECF No. 94-11.  On November 14, 2001, Customs issued Rupari and Stilwell a Penalty Notice which included the same language as the Pre-penalty notice mentioned above.  Pl.'s Br. Penalty Notice, Ex. 24, at 18-20, Nov. 14, 2001, ECF No. 94-13.

On April 7, 2010, Customs filed a complaint against American Casualty claiming that it owed the United States $1,279,648.83 plus statutory interest for unpaid customs duties under bonds pursuant to 19 U.S.C. § § 1505, 1592(d), 1505(c), and 580.  Compl. at ¶1, April 7, 2010, ECF No. 2.

On June 20, 2011, Customs filed a Complaint against Rupari for violations of 19 U.S.C. § 1592 (a). Compl. ¶1, June 20, 2011, ECF No. 2.  The Complaint alleged that Defendant attempted to enter five containers of Chinese crawfish tail meat by means of documents falsely claiming that the crawfish tail meat originated in Thailand. Id. at ¶8.  Customs sought the domestic value of the merchandise Rupari attempted to enter into the United States which was $2,784,636.18, or in the alternative, the maximum amount for grossly negligent or negligent violations of 19 U.S.C. § 1592. Id. at ¶52.

On December 22, 2011, this Court ordered that the case against American Casualty be consolidated with that against Rupari. Order, Dec. 22, 2011, ECF No. 22.

On May 13, 2013, Stilwell died.  Def.'s Mot. to Dismiss Public Version, Death Certificate Ex. 5, at 1, July 19, 2013, ECF No. 75-5.  Additionally, Floyd died, however, his date of death is not known by the court.  On January 22, 2014, Customs conducted the deposition of a confidential informant who recounted an alleged conversation with Stilwell in which Stilwell stated that [[


]]  Pl.'s Br. Conf. Dep. of Confidential Informant Ex., 1 at 7, ECF No. 80.

Subsequently, Defendant filed a motion to dismiss arguing that Customs failed to properly allege fraud with particularity and Customs failed to exhaust its administrative remedies for Counts II (gross negligence) and III (negligence). Def.'s Br. at 4-5.

Customs opposes Defendant's Motion to Dismiss, and it also requests leave to amend its Complaint.  Pl.'s Br. at 13.

## DISCUSSION

There are three issues that the court must analyze in addressing Defendant's Motion to Dismiss: (1) whether the court should allow Customs to amend its Complaint; (2) whether Customs alleged fraud with particularity; (3) whether Customs failed to exhaust its administrative remedies with respect to negligence and gross negligence.

1. **Whether the court should allow Customs to amend its Complaint.**

Customs seeks leave to amend its Complaint, reasoning that Defendant would not suffer any prejudice, because this action has advanced significantly beyond discovery, Defendant answered the complaint, and Defendant waited until the close of discovery to file its Motion to Dismiss. Pl.'s Br. at 13-14. Customs also notes that this is its first request to amend the complaint. Id.

Defendant opposes Customs' request to amend, because it argues that waiting years after the Complaint was filed to amend by adding new information constitutes undue delay that prejudices their case. Def.'s Reply to Pl.'s Resp. to Def.'s Mot. to Dismiss Confidential Version at 5-6, Mar. 29, 2015, ECF No. 98 ("Def.'s Reply").

Rule 15 of the Rules of the U.S. Court of International Trade provides that "[t]he court should freely give leave" to amend a pleading "when justice so requires." USCIT R. 15(a)(2). While Rule 15 requires that leave to amend be freely given, the Court must also consider whether there was undue delay, bad faith or dilatory motive on the part of the Plaintiff, undue prejudice to the opposing party, a repeated failure to cure deficiencies by amendments previously allowed, and futility of amendment. Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222, 226 (1962).

The view that delay becomes undue when it prejudices the opposing party is generally accepted. Ford Motor Co. v. United States, 19 CIT 946, 956, 896 F. Supp. 1224, 1231 (1995) (citing United States v. Mex. Feed & Seed Co., 980 F.2d 478, 485 (8th Cir. 1992)). In turn, to demonstrate prejudice, Defendant "must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the amendment been timely." Id. (quoting Cuffy v. Getty Ref. & Mktg. Co., 648 F.Supp. 802, 806 (D.Del. 1986)).

First, Defendant argues that the inclusion of the Declaration of Porter would prejudice it, because the Declaration details a phone conversation between Porter and Floyd, in which Floyd allegedly stated that the crawfish tail meat was from China. Def.'s Reply at 7. Floyd is now deceased, and Defendant contends that as a result of his death, it has been deprived of an opportunity to challenge Porter's statements. Id.

Although Floyd is deceased, Defendant argues that the May 4, 1998 fax from Floyd to Porter, occurring the same day as the phone call, shows that the conversation was limited to whole crawfish which are not within the scope of the antidumping order. Specifically, Defendant points out that the fax refers to crawfish "in the whole round" and "whole cooked product." Id. at 8.

Defendant has not been deprived of an opportunity to challenge Porter's statements, because the contemporaneous fax to

Porter could show that the conversation was limited to whole crawfish which are not within the scope of the antidumping order. Id. Defendant is not prejudiced by the inclusion of Porter's Declaration or the fax, because it has not been deprived of an opportunity to challenge Porter's statements. See Ford, 19 CIT at 956, 896 F. Supp. at 1231. The court will allow Customs to amend its Complaint to include information relative to the Declaration of Porter.

Defendant also argues that amending the Complaint to include additional facts to support Count I, fraud, would be futile. Def.'s Reply at 5. Specifically, Defendants argue that including facts relating to the facsimile from Wang, Yupeng and Seamaster's owner, to Rupari and Stilwell would not survive a motion to dismiss, because the government's conclusion that the goods were transshipped to the U.S. from China and that Rupari and Stilwell were aware of the transshipment does not logically flow from the facsimile. Id. at 8.

If an amendment would not survive a motion to dismiss pursuant to USCIT Rule 12(b)(6), it is deemed futile. United States v. Active Frontier Int'l, Inc., 37 CIT ___, Slip Op. 13-8 (Jan. 16, 2013). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Twombly, 550 U.S. at 570, 127 S. Ct. at 1974, 167 L. Ed. 2d at 949. To be plausible,

the complaint need not show a probability of plaintiff's success, but it must evidence more than a mere possibility of a right to relief. Id. at 556-57, 127 S. Ct. at 1965-66, 167 L. Ed. 2d at 940-41.

The court finds that amending the Complaint to include the information discussed in the facsimile would not be futile, because the amendment would survive a motion to dismiss. See Active Frontier Int'l, Inc., 37 CIT ___, Slip Op. 13-8 (Jan. 16, 2013). The amendment would survive a motion to dismiss, because it evidences a more than a mere possibility of a right to relief, as one could reasonably interpret the fax to show that Rupari was aware of the transshipment of crawfish tail meat.  See Twombly, 550 U.S. at 570, 127 S. Ct. at 1974, 167 L. Ed. 2d at 949; see also Pl.'s Br. Facsimile from Wang to Rupari Ex. 16, at 1.

Next, Defendant argues that the inclusion of the deposition testimony of a confidential informant who recalled a verbal, unrecorded, conversation with the now deceased Stilwell will prejudice its case.  Def.'s Reply at 10. Customs seeks to amend the Complaint to include the deposition testimony, because [[



                                                                      ]]

The Defendant has been deprived of an opportunity to present

evidence it would have offered had the amendment been timely, specifically Stilwell's testimony, to rebut the confidential informant's account of the purported conversation with Stilwell, because Stilwell died on May 13, 2013, and the deposition of the confidential informant occurred afterwards on January 22, 2014. See Ford, 19 CIT at 956, 896 F.Supp. at 1231; Def.'s Br. Stilwell Death Certificate Ex. 5 at 1, ECF No. 75-5; Pl.'s Br. Dep. of Conf. Informant Ex. 1, at 1.  Consequently, inclusion of this deposition will prejudice Defendant, and the court will not permit Customs to amend its complaint to add this information.

**2. Customs alleged fraud with particularity.**

The Defendant argues that Customs' Complaint fails to contain sufficient underlying facts creating a plausible inference that Rupari knew the statements contained in letters and other documents to Customs were false and that they intended to deceive Customs. Def.'s Br. at 5-6.  The Court disagrees.

Rule 9(b) of the Rules of the Court of International Trade requires that Customs "state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  USCIT R. 9(b). Even though knowledge and intent may be alleged generally, the pleadings must "allege sufficient underlying facts from which a court may reasonably infer that party acted with the requisite state of mind."  Exergen Corp. v. Wal-

Mart Stores, Inc., 575 F.3d 1312, 1327 (Fed. Cir. 2009). "A fraud pleading must include informational elements of 'who, what, when, where, and how: the first paragraph of any newspaper story.'" United States v. Islip, 22 CIT 852, 869, 18 F.Supp.2d 1047, 1063 (1998) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)). "Most courts have required the claimant to allege at a minimum the identity of the person who made the fraudulent statement; the time, place, and content of the misrepresentation; the resulting injury; and the method by which the misrepresentation was communicated." Islip, 22 CIT at 869, 18 F.Supp.2d at 1063 (citing 2 Moore's Federal Practice § 9.03, at 9-18 n.12 (3d ed.1998)).

Defendant contends that the bare fact that Rupari had done business with Seamaster's Chinese parent company, Yupeng, prior to the imposition of antidumping duties does not permit the inference that Rupari knew that the crawfish originated in China. Def.'s Br. at 7. Defendant is correct that this fact alone does not permit the inference that Rupari definitively knew the origin of the crawfish to be China, but this individual fact cannot be viewed in a vacuum as suggested by Defendant. Rather, this fact must be viewed in light of the other facts mentioned in the Complaint, as discussed below.

[[

]]

Customs argues that the Declaration of Porter shows that Rupari knew that the crawfish tail meat was from China, and thus Customs pled fraud and intent with particularity. Pl.'s Br. 17-18.  In his Declaration, Porter recounts a conversation on May 4, 1998, with Floyd, in which Floyd allegedly told him that Rupari's "Chinese crawfish tail meat" was cheaper than all of the others, because the meat was shipped to Thailand where it was processed and then it "would not be known as Chinese crawfish." Pl.'s Br. Porter Decl.  Ex. 10, at ¶10.

In contrast, Defendant claims that the facsimile from Floyd to Porter on May 4, 1998, sent the same day as the conversation, shows that the conversation was limited to whole crawfish, which is not within the scope of the antidumping order, as the fax referred to crawfish "in the whole round" and as "whole cooked product." Pl.'s Br. Fax from Floyd to Porter Ex. 20, at 1.

Nevertheless, given that POPCA and Rupari previously signed a contract for the supply of "Chinese [c]rawfish [t]ail [m]eat," and that the court construes the facts in the light most favorable to the plaintiff in reviewing a motion to dismiss, the court finds that Customs pled knowledge and intent with enough particularity that its fraud claim survives the Motion to Dismiss. See Pl.'s Br. Purchase Agreement between POPCA and Rupari, Ex. 10, at 13; see also Bank of Guam, 578 F.3d at 1326.

Moreover, Plaintiff pled fraud with particularity, because the complaint detailed the identity of the person who made the fraudulent statement; the time, place, and content of the misrepresentation; the resulting injury; and the method by which the misrepresentation was communicated. See Islip, 22 CIT at 869, 18 F.Supp.2d at 1063. Specifically, the complaint alleged that Stilwell, an employee of Rupari, fraudulently stated in a letter dated July 1, 1998, to Customs on behalf of Seamaster, the importer of record, that the crawfish tail meat in the five seized entries was processed and packed by Sea Bonanza in Thailand from raw

crawfish harvested by Mahyam in Thailand. Compl. ¶23; see id. Customs further alleged that these statements had the potential to influence its assessment of antidumping duties. Compl. at ¶35. Moreover, the complaint alleged that Rupari, through its employee Stilwell, filed on July 13, 1998, a series of documents with Customs which it knew to contain false representations that Thailand was the country of origin of the crawfish tail meat. Id. at ¶27. The documents included the following: a purported letter from Mahyam stating that it cultivated live crawfish which it sold to Sea Bonanza, invoices for the sale of live crawfish, and a letter purportedly from Sea Bonanza stating that it purchased crawfish from Mahyam that it processed into tail meat for sale to Seamaster. Id.

Finally, Defendant contends that Customs failed to plead fraud with particularity, because the fax from Yupeng to Rupari does not demonstrate that Rupari knew that the crawfish tail meat was from China at the time it responded to Customs. Def.'s Br. at 8. The fax was sent on July 25, 1998, after Stilwell made representations and submitted documentation to Customs on July 1, 10, and 13, 1998. Pl.'s Br. Facsimile from Wang to Rupari Ex. 16.

Although the fax, in and of itself, may not show that Rupari knew that the statements were false at the time they were made to Customs, as the statements occurred before the fax, the fax could plausibly show that Rupari discovered that its statements

were false after it sent its last response to Customs on July 13, 1998, and that it failed to inform Customs that its previous statements, made just days before, were untrue.  Thus, Plaintiff pled fraud with enough particularity to survive Defendant's motion to dismiss.

### 3. Exhaustion of Administrative Remedies

28 U.S.C. § 2637(d) provides that "[i]n any civil action not specified in this section, the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d).  If a new level of culpability is first introduced in Court and not at the administrative level, the party against whom the claim is alleged has been prevented from seeking mitigation of the monetary penalty at the administrative level as contemplated by 19 U.S.C. § 1592(b) and 19 U.S.C. § 1618. United States v. Optrex, 29 CIT 1494, 1500 (2005) (not reported in federal supplement); see also Def.'s Br. at 12.

Defendants charge that Commerce failed to exhaust its administrative remedies for Count II, gross negligence, and Count III, negligence, because, although the penalty letters indicated that Customs alleged negligent and gross negligent violations in the alternative, Customs did not pursue such claims.  Def.'s Br. at 11, 14. The court disagrees.

Defendants rely on Optrex to support their position. See Optrex, 29 CIT at 1500.  In Optrex, Customs issued a pre-

penalty notice which alleged that Optrex was negligent in providing insufficient information in the entry documents to enable Customs to determine the correct classification of its products. Id. at 1495. The final penalty claim against Optrex was based on negligence. Id. Customs then filed suit on a negligence theory. Id. at 1495-96. Subsequently, Customs sought leave of the court to amend its complaint to include penalties for fraud and gross negligence. Id. at 1496. The court in Optrex denied Customs' motion reasoning that "the statute was designed to give an importer an opportunity to fully resolve a penalty proceeding before Customs, before any action in this Court." Id. at 1500-03. In other words, Optrex was denied an opportunity to resolve the fraud and gross negligence claims before the action was filed in this Court, as these claims were not mentioned in the pre-penalty and penalty notices. Id. at 1495-1503.

The facts in the instant case are not analogous to those in Optrex. See id. Unlike in Optrex, here, Customs alleged negligence and gross negligence in the alternative in both the pre-penalty and penalty notices:

> Inasmuch as the Government may plead in the alternative in any de novo proceeding before the Court of International Trade, Customs alternatively alleges that the violation in question occurred as a result of negligence or gross negligence. (Emphasis added).

Pl.'s Br. Pre-penalty Notice, Ex. 19, at 2; Pl.'s Br. Penalty Notice, Ex. 24, at 18-20. Here, by listing the negligence and gross negligence claims in the notices, Customs put the Defendant on notice that they were pursuing penalties for negligence and gross negligence in the event they could not prove fraud. Customs thereby presented Defendant with the opportunity to resolve the negligence and gross negligence claims at the administrative level.

Defendant cannot say that it was deprived of a chance to mitigate the gross negligence and negligence penalties before Customs commenced this action. Defendant responded to the Pre-penalty notice by letter dated June 8, 2001, in which it argued that it acted in a commercially reasonable manner under the common law standard of care, and that there were several mitigating factors in favor of cancelling the penalties for gross negligence and negligence. Pl.'s Br. Letter from Becker & Poliakoff to Customs, Ex. 23, at 1-19, June 8, 2001; see United States v. CTS Holding, LLC, 39 CIT ____, Slip Op. 15-70 (June 30, 2015) (finding that "Defendant's attempts to resolve the penalty claim before Customs, prior to Plaintiff's bringing this action, demonstrate that Defendant received sufficient, actual notice that the claim sounded in negligence.") Accordingly, Customs afforded Defendant an opportunity to resolve the negligence and gross negligence claims at the administrative level before the action was commenced

in this Court.  Defendant's own arguments show that it believed
Customs pursued penalties for gross negligence and negligence in
the event that fraud could not be proven.

As with Optrex, Defendant also mistakenly relies on
United States v. Nitek Electronics, Inc., 844 F.Supp.2d 1298, 1298
(2012) (Not reported in Court of International Trade Reports),
appeal filed and docketed, Appeal No. 15-1166 (Fed. Cir. ____).
In Nitek, the court barred a penalty claim and held that Customs
failed to perfect its penalty claim where it sought to recover a
penalty "based upon a degree of culpability (negligence) that
differs from that alleged at the administrative level (gross
negligence)." Id. at 1305.  In Nitek the court also found that
"nothing prevented Customs from bringing penalty claims for both
negligence and gross negligence in the alternative, as it has done
in the past." Id. at 1308.

By contrast, in this case, the degrees of culpability
alleged in the complaint, (fraud, or in the alternative gross
negligence, or negligence) were exactly the same as those alleged
at the administrative level (fraud or in the alternative gross
negligence, or negligence). Id. at 1305.  Unlike in Nitek, here,
Customs brought the negligence and gross negligence claims in the
alternative. See id. It cannot be said that Customs did not perfect
its penalty claim or that Defendants were robbed of an opportunity

to resolve the negligence and gross negligence claims at the administrative level. See id.

Defendant also contends that the gross-negligence and negligence claims must be dismissed, because Customs failed to disclose all material facts establishing those violations in its Pre-Penalty notice. Def.'s Br. at 14.

In order to bring a section 1592 claim in this Court, several statutory requirements must be met at the administrative level. 19 U.S.C. § 1592 (b)(1). When Customs has reasonable cause to believe there has been a violation of section 1592 it must issue a pre-penalty notice which "disclose[s] all the material facts which establish the alleged violation."  Id. at (b)(1)(A)(iv).

A violation is grossly negligent where it results from an act or omission done with actual knowledge of or wanton disregard for the relevant facts and with indifference to or disregard for the offender's obligations under the statute. 19 C.F.R. Pt. 171, App. B (C)(2). In the Pre-penalty Notice, Customs wrote that Rupari purchased crawfish from Yupeng Fishery Ltd. in China, knowing that the crawfish originated in China, and prepared invoices and entry documents falsely stating that the crawfish originated in Thailand. Pl.'s Br. Pre-penalty Notice, Ex. 19, at 3. The notice further alleged that this was done to avoid paying antidumping duties in contravention of Rupari's obligations under the statute. Id.  The court finds that Customs disclosed all

material facts which establish gross negligence and it denies

Defendant's motion to dismiss the gross negligence claim.

Negligence requires facts that establish that a duty of

reasonable care and competence existed and that Defendant failed

to exercise reasonable care and competence in making statements or

providing information to Customs.   19 C.F.R. Pt. 171, App. B

(C)(1).   Here, although Customs did not explicitly state that

Rupari owed a duty and breached that duty in the Pre-penalty and

Penalty notices, clearly, Rupari was adequately apprised of the

fact that this negligence claim involved allegations that Rupari

breached a duty of reasonable care, as evidenced by Rupari's own

arguments against a finding of negligence by Customs at the

administrative level:

> Rupari conducted itself in a commercially
> reasonable manner . . . . [A] general custom,
> use, or practice by those in the same business
> or trade may be considered some evidence of
> what constitutes reasonable conduct in that
> trade or business . . . . Other domestic buyers
> of crawfish and other seafood will, if
> necessary, testify that Rupari's actions were
> no different than most such other domestic
> buyers in similar situations.

Pl.'s Br. Letter from Becker & Poliakof to Customs, Ex. 23, at 4-

5, June 8, 2001; see also United States v. Dantzler Lumber & Export

Co., 16 CIT 1050, 1059, 810 F.Supp. 1277, 1285 (1992) (finding

that as long as Defendants were adequately apprised of the scenario

of the action, Customs has met the requirement of disclosing all

material facts establishing the violation). Thus, the court declines to dismiss the negligence count.

### CONCLUSION

For the reasons stated above, Plaintiff's request for leave to amend the Complaint is granted in part and denied in part consistent with this opinion.  It is further

**ORDERED** that Defendant's Motion to Dismiss is **DENIED**; it is further

**ORDERED** that Plaintiff's Request for Leave to Amend the Complaint is **GRANTED IN PART AND DENIED IN PART,** consistent with the court's opinion; it is further

**ORDERED** that Plaintiff shall file an Amended Complaint, consistent with this opinion, no later than August 31, 2015; it is further

**ORDERED** that Defendants must submit their Amended Answer no later than September 21, 2015; and it is further

**ORDERED** that Plaintiff and Defendants must submit a joint proposed scheduling order no later than September 28, 2015.

**SO ORDERED.**


                                              /s/ Nicholas Tsoucalas
                                              **Nicholas Tsoucalas**
                                              **Senior Judge**

**Dated:**  August 24, 2015
           **New York, New York**